**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSHUA HARRIS and DONITA OLDS, on behalf of Plaintiffs and the class members described herein, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 1:23-cv-16429 |
| W6LS, INC., doing business as WithU and WithU Loans; CALIBER FINANCIAL SERVICES, INC., and DOES 1-20, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT – CLASS ACTION

1.      Plaintiffs Joshua Harris and Donita Olds bring this action to secure redress from predatory and unlawful loans (such as Exhibits A-B). The loans are made in the name of Defendant W6LS, Inc., doing business as WithU and WithU Loans ("WithU"). Caliber Financial Services, Inc., and Does 1-20 are involved in the making, funding and collection of the loans.

2.      Plaintiffs seek a declaratory judgment that the loans are void (Count I), damages pursuant to the Illinois Interest Act, 815 ILCS 205/6 (Count II), damages and injunctive and declaratory relief pursuant to the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq.* and the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.* (Count III – the Predatory Loan Prevention Act provides that violations are a violation of the Illinois Consumer Fraud Act); treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §1964 (Count IV); and damages under the Electronic Funds Transfer Act, 15 U.S.C. §1693 et seq. ("EFTA") (Count V).

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (general federal question), 15 U.S.C. § 1693m (EFTA), 18 U.S.C. § 1964 (RICO), 28 U.S.C. §1337 (interstate

-1-

commerce), and 28 U.S.C. § 1367 (supplemental jurisdiction). Jurisdiction may also exist under 28 U.S.C. § 1332(d) (Class Action Fairness Act).

4.     This Court has personal jurisdiction over Defendants because they:

a.     Knowingly participated in the making and collection of unlawful loans to Illinois residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello*, 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures*, 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b.     Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group*, *LLC,* 622 F.3d 754, 760 (7th Cir. 2010).

5.     Venue is proper because acts to obtain and collect the loans impacted Plaintiffs in Illinois.

6.     Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8%

interest.

## PARTIES

### Plaintiffs

7.      Plaintiff Joshua Harris is a natural person and resident of Cook County, Illinois.

8.      Plaintiff Donita Olds is a natural person and resident of Bureau County, Illinois.

### Defendant W6LS, Inc.

9.      Defendant W6LS, Inc., doing business as WithU and WithU Loans ("WithU"), claims to be a corporation organized under the laws of the Otoe Missouria Tribe of Indians ("Tribe"), a federally-recognized Indian Tribe in Oklahoma. It also claims to be owned by the Tribe. Plaintiff disputes this.

10.     Defendant W6LS, Inc., doing business as WithU and WithU Loans, operates an online lending website, www.WithULoans.com, which makes loans at interest rates exceeding 400% to consumers in many states, including Illinois.

11.     Defendant W6LS, Inc., uses the address of 10600 S. Pennsylvania Ave., Suite 16 #828, Oklahoma City, OK 73170-4257.

12.     In fact, this address is a rented private mailbox in a UPS store.

13.     The actual principal place of business of Defendant W6LS, Inc., is in Mission, Kansas.

14.     The Otoe-Missouria Tribe of Indians also claims, or claimed to operate, now or in the past, several other online payday lenders, including: (1) American Web Loan, (2) Clear Creek Lending, and (3) Great Plains Lending.

15.     Each of these lenders provided off-reservation addresses as their offices, and all of them were rented mailboxes at the same private mailbox provider.

### Defendant Caliber Financial Services, Inc.

16.     Defendant Caliber Financial Services, Inc., claims to be a corporation organized under the laws of the Tribe. It also claims to be owned by the Tribe. Plaintiffs dispute this.

17.     Defendant Caliber Financial Services, Inc., states on its website, www.CaliberFS.com, that its address is 1611 S. Utica Ave, #527, Tulsa, OK 74104-4909. This address is also a rented UPS Store mailbox.

18.     Defendant Caliber Financial Services, Inc., states on its website that "We are headquartered in Red Rock, OK with additional offices located in Mission, KS."

19.     The website contains a list of job openings. In September 2023, it listed:

        a.      Executive Administrative Assistant  –  Overland Park, KS;

        b.      IT Solution Architect  –  Overland Park, KS;

        c.      Technical Business Analyst  –  Overland Park, KS;

        d.      Collection Specialist  –  Mission, KS;

        e.      Facilities Coordinator  –  Overland Park, KS. (Exhibit C)

20.     Previously, Caliber listed employment openings for positions as a: (1) Human Resource Assistant; (2) Growth Marketing Manager; and, (3) Senior Direct Marketing Manager, all of which listed the "location" as Mission, Kansas.

21.     Defendant Caliber Financial Services, Inc., states on its website, www.CaliberFS.com, that it provides "Next Gen Fintech Solutions All In One Place," that "We provide end-to-end portfolio management and personalized fintech solutions for partners who want to expand their portfolio and product offerings," and that "We have the experience, mindset, processes and tools to create real-time, streamlined experiences and personalized fintech solutions that provide expanded revenue streams for the Otoe-Missouria Tribe of Indians."

22.     In the argot of the online lending world: "fintech," means Financial Technology companies; "portfolio management" refers to the business of overseeing and collecting short-term payday loans for a fee on behalf of a third party; and "partners" refers to beneficial owners of online lending websites, who provide the working capital to fund loans and who exert high levels of control over the enterprises.

23.     Thus, translated into plain English, Caliber's website states it manages collection and

underwriting operations on behalf of non-tribal investors who wish to profit from a "tribal" lending model.

## Defendants Does 1-20

24.     Defendants Does 1-20 are other natural or artificial persons involved in the making of short-term, high-interest loans via a business known as WithU Loans. They perform such activities as (1) providing capital to fund the loans; (2) requesting consumer credit reports on potential borrowers; (3) marketing the lending website; (4) brokering; and/or (5) providing banking services, which include ACH/debit card payment processing and servicing the loans.

## FACTS

25.     On or about May 22, 2023 Plaintiff Harris obtained a $600 loan from www.WithULoans.com over the internet, with a disclosed annual percentage rate of 498.63%. (Exhibit A)

26.     On or about December 22, 2022, Plaintiff Olds obtained a $600 loan from www.WithULoans.com over the internet, with a disclosed annual percentage rate of 497.25%. (Exhibit B)

27.     Plaintiffs made payments on the loans, including interest.

28.     Exhibits A-B are written on a standard form loan agreement used by Defendants on a regular basis.

29.     Defendants regularly make loans to individuals in Illinois at such rates.

30.     The loan was obtained for personal, family or household purposes and not for business purposes.

31.     At no time has any Defendant had a license from the Illinois Department of Financial and Professional Regulation or a state or federal banking or credit union charter, entitling it to make loans to Illinois residents at more than 9% interest.

32.     Defendants nevertheless advertise and make loans to Illinois residents at rates greatly exceeding 9%.

33.     Plaintiffs signed the loan agreement electronically, while in Illinois.

34.     The funds were transferred electronically to Plaintiffs' bank accounts in Illinois.

35.     On information and belief, the transfer was carried out by one of the Does.

36.     Repayment was to be made by ACH debit of Plaintiffs' bank account in Illinois.

37.     The ACH debits were also carried out by one of the Does.

38.     Plaintiffs were in Illinois at all times.

39.     At no time did Plaintiffs visit the state of Oklahoma or any business premises of any Defendant in connection with the loans.

40.     WithU's website states that it does not lend in all states and that borrowers should call a specified number to find out if it lends to residents of their state. (Exhibit D)

41.     The server hosting the WithU website is located in California. (Exhibit E)

42.     Defendants were aware that Illinois and other states have rate limitations that applied to their loans. Prior to the loan to Plaintiffs, Defendants received a notice from the State of Washington that their loans to residents of that state were illegal. (Exhibit F)

43.     Defendants decided to ignore Illinois' rate limitations because they concluded that Illinois authorities were unlikely to take action to enforce them against them.

## ILLINOIS PROHIBITIONS ON PREDATORY LOANS

44.     Effective March 23, 2021, the Illinois Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%. 815 ILCS 123/15-1-1 *et seq.* "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

45.     Under 815 ILCS 123/15-10-5(b), "Any violation of this Act, including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

46.     Both before and after March 23, 2021, it was unlawful for anyone who did not have

a bank or credit union charter or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest. 815 ILCS 122/1-15, 4-5; 205 ILCS 670/1.

47.     Any loans to Illinois residents at more than 9% that are made by unlicensed persons are void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Instalment Loan] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."); 815 ILCS 122/4-10(h) ("(h) Notwithstanding any other provision of this Section, if a lender who does not have a license issued under this [Payday Loan Reform] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the lender who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

48.     Any loans to Illinois residents at more than 9% that are made by unlicensed lenders violate the Interest Act, 815 ILCS 205/4, and are subject to statutory damages under 815 ILCS 205/6.

49.     Illinois has a criminal usury statute defines the making of a loan by unlicensed persons at more than 20% interest as a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq*). It applies to a person who "while either within or outside the State, by his own conduct or that of another for which he is legally accountable," engages in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State." 720 ILCS 5/1-5.

50.     Contracts made in violation of licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice of law clauses or other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017) ("That

New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.,* 16cv2781, 2017 U.S. Dist. LEXIS 64761, 2017 WL 1536427, *7 (D.N.J., April 28, 2017).

51.     The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *E.g., In the Matter of Red Leaf Ventures, LLC,* No. 12 CC 569); *In the Matter of Money Mutual, LLC*, No. 12 CC 408;*In the Matter of Hammock Credit Services*, No. 12 CC 581; *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133.

52.     The excessive interest charges imposed by Defendants were willful.

## INVALIDITY OF CLAIM OF TRIBAL IMMUNITY

53.     In an attempt to evade prosecution under usury laws of states like Illinois, online lenders frequently create an elaborate charade claiming their otherwise illegal businesses are entitled to the sovereign immunity of Native American tribes.

54.     However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

55.     To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

56.     These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, are conducted by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement

-8-

is effectively nil.

57.     Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

58.     Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

59.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.,* No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote,* 961 F.3d 105 (2d Cir. 2020).

60.     A review of the online resumes of Caliber employees shows none with any connection to the Tribe or that live on the Tribe's reservation.

61.     On March 22, 2023 (Exhibit G), and again on September 21, 2023 (Exhibit H), the LinkedIn profile for Charlie Corbin, "Recruiting Manager at Caliber Financial Services" contained links for open positions in "Overland Park, Kansas," "Mission, Kansas" or "Kansas City Metropolitan Area."

62.     Corbin's own location was given as Sugar Land, Texas.

63.     Tim Madsen, Chief Marketing Officer at Caliber, gave his location as Mission, Kansas (Exhibit I), as did Doug Oliveira, Chief Information Officer (Exhibit J).

64.     On information and belief, no open positions for employment with Caliber list the

Tribe's reservation in Oklahoma as a work-site.

65.     Virtually none of WithU's business is conducted on the Tribe's reservation.

66.     All essential business operations are performed in other locations outside of the Tribe's jurisdiction.

67.     Off-reservation business operations, comprising substantially all of the company's functions, are conducted by and for the benefit of non-tribal members and investors.

68.     The argument that, because the Tribe's name appears on WithULoans.com as the owner of the business, it is owned by the Tribe, is meritless.

69.     The Tribe receives only a couple of pennies of each dollar as "rent," and 98% or more of revenues flow to non-tribal persons and entities.

70.     While the Tribe's name and the names of some officers appear in documents establishing the formation of the corporate charters under which WithU and Caliber operate, on information and belief, such documents were designed, written by, approved by, and crafted for the benefit of non-tribal beneficiaries.

71.     According to the U.S. Department of Health and Human Services, per capita income for the Tribe in between 2015 and 2019 averaged $13,887 per year. See https://www.acf.hhs.gov/sites/default/files/documents/cb/tribal-fmap reference-fy2022.pdf.

72.     The Tribe has no significant assets to leverage as collateral for the multi-million dollar revolving lines of credit required to fund multiple online payday lending enterprises which lend upward of $100 million a year.

73.     On information and belief, while the Tribe is the nominal owner of WithU and Caliber, covenants in the lines of credit used as working capital to fund loans require the Tribe to hire only investor-approved managers, underwriters, marketers, software vendors, and other service providers.

74.     The loan covenants also require the Tribe to waive sovereign immunity with respect to the non-tribal investors, leaving the Tribe vulnerable to legal action.

-10-

75.     Thus, the Tribe exerts no control over the business, how it is operated, who it lends to, and so forth. Any tribal involvement does not go beyond the hiring of a handful of tribal members to work as phone customer service representatives or similar low-level jobs.

76.     The Tribe has engaged in other similar "rent-a-tribe" schemes with other non-tribal investors in the past, including one which resulted in a class action lawsuit being filed against it.

77.     In July 2021, a federal court approved an $86 million settlement in which plaintiffs alleged the Tribe engaged in a rent-a-tribe scheme concerning American Web Loan; non-tribal individuals and entities – including two Wall Street Hedge Funds – colluded to make illegal loans to consumers at triple-digit interest rates and make it appear that the Tribe was the owner of the lending enterprise, despite the Tribe having almost no involvement in the loans and receiving less than 2% of revenues. *Solomon v. American Web Loan*, 375 F. Supp. 3d 638 (E.D. Va. 2019).

78.     Weeks after the court's final approval of the $86 million settlement, WithU began lending operations.

## DEFENDANTS VIOLATE THE EFTA BY REQUIRING ELECTRONIC PAYMENT

79.     When Plaintiffs applied for loans, they were required to provide bank account and routing numbers for the purpose of allowing the Defendants to automatically debit payments electronically from Plaintiffs' bank accounts.

80.     WithULoans.com only accepts applications online and the website will not allow an application for credit to proceed without the consumer supplying bank account and routing information. (Exhibit K)

81.     When Plaintiffs were approved for loans, they were provided with several documents to electronically sign, including a Loan Agreement and an "EFT Authorization Agreement."

82.     The "voluntary electronic debit payment authorization" includes a provision whereby Plaintiffs were required to consent to the WithU initiating ACH debits from their accounts to make the required bi-weekly loan payments.

83.     While couched as voluntary, WithU will not approve a loan application which does not contain a signed, "voluntary" electronic payment agreement.

84.     Although a consumer can elect to terminate the electronic payment agreement, they are required to "provide us another form of payment acceptable to us." However, the fact that the agreement neglects to provide any other means of payment or an address for payments.

85.     Moreover, a consumer can only terminate the electronic funds transfer authorization only after a loan has originated.

86.     WithU's business model of making unsecured subprime consumer loans depends on being able to debit loan payments concurrently to when the consumer is paid, thereby being the "first in line" to receive proceeds from the consumer's paycheck.

87.     Loan applicants are required to disclose to WithU their pay schedule to facilitate WithU's capture of payments.

88.     Under the EFTA and Regulation E, the implementing regulation of the EFTA, "[n]o . . . person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers...." 12 C.F.R. §1005.10(e)(1); 15 U.S.C. §1693k(1).

89.     Thus, WithU violated the EFTA when it conditioned the loans on Plaintiffs' consent to ACH debits.

### COUNT I - DECLARATORY AND INJUNCTIVE RELIEF AGAINST ILLEGAL CONDUCT

90.     Plaintiffs incorporate paragraphs 1-89.

91.     This claim is against all Defendants.

92.     There is a controversy between Plaintiffs and the class, on the one hand, and Defendants, on the other, as to whether Plaintiffs and the class members must repay the loans made to them.

93.     Declaratory relief will resolve such controversy.

94.     An injunction is necessary to prevent Defendants from taking any action to collect

the void debts.

## CLASS ALLEGATIONS

95.  Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(2).

96.  The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made through www.Withu.com at more than 9% interest (c) which loan has not been paid in full.

97.  Plaintiffs may alter the class definition to conform to developments in the case and discovery.

98.  The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

99.  There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

100.  Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

101.  Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

102.  Defendants have acted on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate.

103.  The class is entitled to a declaration that Defendants are not entitled to collect on the loans described, an injunction against any further collection efforts by Defendants, and restitution of all such amounts collected by Defendants.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and

against Defendants for:

          i.      Injunctive relief;

          ii.     Declaratory relief;

          iii.    Restitution of all amounts collected on the loans from members of

                the class;

          iv.    Costs of suit; and

          v.     Such other and further relief as the Court deems proper.

## COUNT II – ILLINOIS INTEREST ACT

104. Plaintiffs incorporate paragraphs 1-89.

105. This claim is against all Defendants.

106. Defendants contracted for and collected loans at more than 9% interest from Plaintiffs and the class members, in violation of 815 ILCS 205/4.

107. Plaintiffs and the class members are entitled to statutory damages under 815 ILCS 205/6.

## CLASS ALLEGATIONS

108. Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

109. The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made through www.Withu.com at more than 9% interest (c) which loan is still outstanding or has been paid on or after a date two years prior to the filing of suit.

110. Plaintiffs may alter the class definition to conform to developments in the case and discovery.

111. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

112. There are questions of law and fact common to the class members, which common

-14-

questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

113.    Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

114.    Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

115.    A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.    Individual actions are not economically feasible.

      b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

      i.    Damages as provided in 815 ILCS 205/6.

      ii.    Attorney's fees, litigation expenses and costs of suit; and

      iii.    Such other and further relief as the Court deems proper.

## COUNT III – RICO

116.    Plaintiffs incorporate paragraphs 1-89.

117.    This claim is against Caliber Financial Services, Inc., and Does 1-20, who are the RICO "persons."

118.    All loans made through www.withu.com to Illinois residents are (a) unenforceable under Illinois law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Illinois law, where © the usurious rate is at least twice the enforceable rate (36%).

119.    The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

120.    WithU is an enterprise affecting interstate commerce, in that it is located outside of

Illinois and makes loans to Illinois residents via the Internet.

121.    Defendants Caliber Financial Services, Inc., and Does 1-20 are associated with this enterprise.

122.    Defendants Caliber Financial Services, Inc., and Does 1-20 conducted or participated in the conduct of the affairs of WithU through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

123.    Plaintiffs were deprived of money as a result.

## CLASS ALLEGATIONS

124.    Plaintiffs bring this claim on behalf of a class.

125.    The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of WithU at more than 36% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

126.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

127.    There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

      a.    Whether the loans at issue are "unlawful debts" as defined in RICO.

      b.    Whether WithU is an "enterprise."

      c.    Whether Defendant Caliber Financial Services, Inc., is associated with the enterprise.

      d.    Whether the Does are associated with the enterprise.

      e.    Whether Defendants Caliber Financial Services, Inc., and Does 1-20 conducted or participated in the affairs of WithU through a pattern of making and collecting unlawful loans.

-16-

128.     Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

129.     Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

130.     A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.     Individual actions are not economically feasible.

      b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants Caliber Financial Services, Inc., and Does 1-20 for:

      i.     Treble damages;

      ii.     Attorney's fees, litigation expenses and costs of suit; and

      iii.     Such other or further relief as the Court deems proper.

## COUNT IV – EFTA

131.     Plaintiffs incorporate paragraphs 1-89.

132.     Defendant WithU violated the EFTA and Regulation E with respect to each loan made on or after a date one year prior to the filing of this action.

## CLASS ALLEGATIONS

133.     Plaintiffs bring this claim on behalf of a class.

134.     The class consists of (a) all individuals with Illinois addresses (b) to whom a loan was made in the name of WithU (c) which loan was made on or after a date 1 year prior to the filing of suit.

135.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 100 class members.

136.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant

common questions are:

      a.    Whether WithU's mode of contracting for ACH repayment and other

          practices set forth above violated the EFTA.

      b.    The appropriate damages.

137. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

138. Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

139. A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.    Individual actions are not economically feasible.

      b.    Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendant WithU for:

      i.    Statutory damages;

      ii.    Attorney's fees, litigation expenses and costs of suit; and

      iii.    Such other or further relief as the Court deems proper.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman (ARDC 0712094)
Dulijaza (Julie) Clark (ARDC 6273353)
Matthew J. Goldstein (ARDC 6339033)
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

-18-

## JURY DEMAND

Plaintiffs demand trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

## **DOCUMENT PRESERVATION DEMAND**

Plaintiffs hereby demand that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiffs, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiffs, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiffs demand that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

Exhibits

A       Harris loan agreement

B       Olds loan agreement

C       List of job openings with Caliber Financial Services, Inc.

D       Material from WithU  website

E       location of WithU website server

F       Notice from State of Washington

G       March  22, 2023 LinkedIn profile for Charlie Corbin

H       Sept. 21, 2023 LinkedIn profile for Charlie Corbin

I       Information re Tim Madsen, Chief Marketing Officer at Caliber

J       Information re Doug Oliveira, Chief Information Officer at Caliber

K       WithU credit application